642 F.2d 641
 206 U.S.App.D.C. 236
 VIRGIN ISLANDS
v.
W. Michael BLUMENTHAL, Secretary Department of the Treasury,
Appellant.
VIRGIN ISLANDS, Appellant,
v.
W. Michael BLUMENTHAL, Secretary Department of the Treasury.
 Nos. 79-1021,* 79-1022.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 16, 1979.
Decided Oct. 17, 1980.
Rehearing Denied Dec. 18, 1980.
Certiorari Denied May 18, 1981.
See 101 S.Ct. 2314, 2315.
 
 Ernest J. Brown, Atty., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., and David English Carmack, Atty., Dept. of Justice, Washington, D. C., were on brief for the Secretary of the Treasury as appellant.
 Milton Eisenberg, Washington, D. C., with whom Theodore C. Hirt and Ive Arlington Swan, Charlotte Amalie, V. I., were on brief for the Virgin Islands as appellee in case No. 79-1021 and as appellant in case No. 79-1022.
 Myron C. Baum, Washington, D. C., also entered an appearance for the Department of Justice.
 Before McGOWAN and WALD, Circuit Judges, and JOHN PRATT** United States District Judge for the District of Columbia Circuit.
 Opinion for the court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 In a companion opinion issued today[1] this panel resolves several issues presented by these consolidated appeals. In this opinion we separately address a question concerning the disposition of certain customs duties which is at issue only in the appeals taken in the Virgin Islands case.
 
 
 2
 For more than sixty years the disposition of customs duties collected on goods entering the United States by shipment from the Virgin Islands (the "Islands") has not differed from the disposition of most other customs duties collected on entry in this country; the amounts collected have been paid into the general United States Treasury. Objecting to this disposition, the Islands brought suit in the district court, contending under the applicable statutory language that the proceeds of customs duties levied here on goods shipped from the Islands must be "covered"[2] to the Islands' treasury. The district judge agreed with the Islands and on cross-motions for summary judgment, he "ORDERED and DECLARED that section 28(a) of the 1954 Revised Organic Act of the Virgin Islands requires the ... Secretary of the Treasury to cover into the Treasury of the Virgin Islands all customs duties ... collected on goods transported into the United States from the Virgin Islands ...."[3]
 
 
 3
 We have carefully examined the pertinent statutory language, the statutory, administrative and legislative history, and the full record of the proceedings in the district court. Because we think the ambiguous language of the Revised Organic Act of the Virgin Islands (the 1954 Act),[4] when read in light of its statutory, administrative and legislative history, indicates an intention to produce a result different from that reached by the district court, we vacate the judgment there entered and remand with directions to enter judgment with respect to the 1954 Act in favor of the Secretary of the Treasury.[5]
 
 I. BACKGROUND
 Section 28(a) of the 1954 Act provides:
 
 4
 The proceeds of customs duties, the proceeds of the United States income tax, the proceeds of any taxes levied by the Congress on the inhabitants of the Virgin Islands, and the proceeds of all quarantine, passport, immigration, and naturalization fees collected in the Virgin Islands, less the cost of collecting all of said duties, taxes, and fees, shall be covered into the treasury of the Virgin Islands, and shall be available for expenditure as the Legislature of the Virgin Islands may provide.
 
 
 5
 (emphasis supplied).
 
 
 6
 According to the Islands, it was the "clear objective" of the 1954 Act and its predecessors that "revenues collected by the United States from commerce with the Islands be used for the benefit of the Islands."[6] "This Congressional objective has been thwarted," the Islands argue, by "decisions which, in the guise of interpretation, have rewritten the words of the Congress."[7]
 
 A. History of the Controversy
 
 7
 The controversy dates from 1917, when the United States purchased the Islands from Denmark. Legislation enacted at the time of purchase[8] provided, in consecutively numbered sections, for the imposition of customs duties on Islands goods entering the mainland (section three), for the imposition of customs duties on goods entering the Islands (section four), and for the "cover" to the Islands' treasury of the "duties and taxes collected in pursuance of this Act " (section five) (emphasis supplied).[9] The Islands argue that the Congress that passed the 1917 Act fully intended to cover into the Islands' treasury customs duties on goods shipped from the Islands to the United States as well as customs duties on goods shipped into the Islands from elsewhere.[10]
 
 
 8
 However, less than two months after the 1917 Act became law, the Comptroller of the Treasury interpreted the cover provision quite differently from what the Islands assert was the manifest intention of Congress.[11] The Comptroller's interpretation had the effect of limiting the duties rebated to the Islands treasury to those collected on goods entering the Islands (local duties) and of retaining in the United States treasury those duties collected on goods entering the mainland by shipment from the Islands (mainland duties).[12] The Comptroller reasoned that only those duties specifically authorized for the first time by the 1917 Act were collected "in pursuance of this act;"[13] and that because mainland duties were collected under the previously and separately enacted general laws of the United States, the 1917 Act did not require cover of these duties.[14] The Comptroller's decision was reinforced nine years later when an opinion issued by the Attorney General employed the same reasoning to deny cover of certain internal revenue taxes.[15]
 
 
 9
 Administrative practice concerning the cover of customs duties has not deviated from the Comptroller's interpretation, despite the enactment in 1936 of replacement legislation which omitted the "in pursuance of this Act" language,[16] and despite objections to the practice raised in 1941 by the Department of the Interior in correspondence with the Justice Department.[17] In fact, apart from the position taken by the Interior Department in 1941, objections to this consistent administrative interpretation appear to have lain dormant for more than half a century.
 
 
 10
 The active interest which resurfaced in the 1970's may be attributable in part to the greater autonomy conferred upon the Islands government by recent acts of Congress[18] and in part to that government's awareness of the large sums of mainland duties[19] and fees collected since the 1966 opening of an Islands-based oil refinery.[20]
 
 
 11
 In 1975 the Interior Department, acting at the request of the Islands governor, asked the Justice Department to reconsider its continuing approval of the Comptroller's ruling.[21] The Department's response, however, only reconfirmed its earlier interpretation of applicable law.[22] Earlier overtures to the Treasury Department had been no more successful. Rebuffed in these forums, the Islands brought suit in the district court in May, 1976, seeking, inter alia, declaratory and injunctive relief. The case was submitted for decision in June, 1978 on plaintiffs' motion for partial summary judgment and defendants' motion for summary judgment.
 
 B. The District Court's Decision
 
 12
 The district court agreed with the Islands' interpretation of the 1954 Act and granted summary judgment to the Islands. Conceding some inherent ambiguity in the scope of the "customs duties" required by section 28(a) of the 1954 Act to be covered into the Islands' treasury, the district court nonetheless found an examination of the other provisions of section 28 persuasive of an intent to cover mainland duties into the Islands' treasury. The district court observed that each of the other provisions of section 28 dealt not with locally-imposed duties, taxes, or other local laws,[23] but with the specifics of how more generally applicable United States law would apply to the special situation of the Islands. According to the district court,
 
 
 13
 it becomes clear, when the reference to "customs duties" in section 28(a) is ... (read in the context of the other provisions of section 28) that the term "customs duties" must be interpreted to include those duties imposed on goods transported to the United States from the Virgin Islands.
 
 
 14
 The focus throughout section 28 on internal revenue laws and other laws generally applicable to the Virgin Islands strongly suggests the conclusion that the reference in section 28(a) to "customs duties" was not intended to be limited to those duties imposed under local law on goods imported into the Virgin Islands.[24]
 
 
 15
 In addition, the district court reasoned that if Congress had intended to cover only customs duties locally collected it would have so specified, as it did in the case of quarantine, passport, immigration and naturalization fees. Finally, the district court cited the absence of any indication that Congress intended, either in 1954 or in enacting predecessor legislation, to restrict the covered customs duties to those locally collected.
 
 
 16
 The court rejected the defendants' argument based on settled administrative interpretation of predecessor law as follows:
 
 
 17
 (S)ection 28 cannot properly be viewed as a mere reenactment of section 5 of the 1917 Act; the 1954 Revised Organic Act completely superseded any inconsistent provisions of the 1936 Organic Act and the 1917 Act. See Virgo Corp. v. Paiewonsky, 384 F.2d 569 (3d Cir. 1967), (cert. denied, Master Time Co. v. De Jongh, 390 U.S. 1041, 88 S.Ct. 1633, 20 L.Ed.2d 303 (1968)). Thus, section 28(a) must be read on its own terms and cannot be presumed to have the same meaning as section 5 of the 1917 Act. In fact, the terms of section 28(a) are considerably different from those of section 5 of the 1917 Act and section 28(a) does not include the "in pursuance of this Act" clause relied on so heavily by the Comptroller of the Treasury in support of this narrow construction of section 5. Accordingly, whatever force the interpretation of the Comptroller and the Attorney General may originally have had (and it appears to the Court that their interpretation disregards the clear meaning of section 5), that force has been essentially dissipated by the marked difference between the terms of section 28(a) of the 1954 Act and section 5 of the 1917 Act.[25]
 
 
 18
 Finally, the court rejected an argument that the rebate of duties on goods which were merely passed through the Islands would be "illogical." The court concluded:
 
 
 19
 (I)t is (even) more illogical (to assert) that Congress intended to cover over only the meager customs duties levied on goods imported into the Virgin Islands. As discussed earlier, these goods traditionally have entered the Virgin Islands almost duty free, and the amount of revenues from duties imposed on such goods would be negligible. It would be surprising if Congress intended that only the insubstantial amount of duties collected on imports into the Virgin Islands be covered into the Virgin Islands Treasury.[26]
 
 II. THE MERITS
 
 20
 As already noted,[27] section 28(a) of the 1954 Act requires, in pertinent part, that "the proceeds of customs duties ... be covered into the treasury of the Virgin Islands ...." Literally read, this provision could require cover of all customs duties anywhere collected by the United States government.[28] The patent absurdity of such an interpretation mandates a closer examination of Congressional intent as revealed by the structure of the statute and its legislative history.
 
 A. The 1954 Act
 
 21
 The district court found in section 28's focus on generally applicable United States law a design indicating that section 28(a)'s reference to "customs duties" should be read to include customs duties on goods shipped from the Islands to the mainland.
 
 
 22
 However, we do not agree that the lack of reference to other "local" taxes or duties in section 28 evinces a purpose to cover non-local customs duties. Even apart from the cover provision's history, which we discuss below,[29] we think there is a sound reason for providing for cover of exclusively locally collected customs duties in a section which otherwise tailors generally applicable United States law to the Islands situation. That is because duties imposed at entry in the Islands are collected by the United States customs service,[30] whose employees are required by generally applicable United States law to transmit the monies collected to the United States treasury.[31] Thus the provision's inclusion in section 28 would conform to the statutory scheme identified by the district judge, creating for the Islands a special exemption from generally applicable United States law.[32]
 
 
 23
 Moreover, even if we accepted the premise that section 28 was intended to fashion specific Islands application of general United States law, we would not be required from this to conclude that the customs duties cover was intended to equal the sum of local duties plus duties levied on goods entering the mainland by shipment from the Islands. Additional guidance would be necessary either to explain why the cover should not be more inclusive, given its vague language, or to explain why it should not be more limited, given section 28's focus on transactions with a more substantial connection with Islands activities than merely a stopover in an Islands port.
 
 
 24
 Like the district court, we find in the common elements of section 28's provisions some general guidance for the interpretation of section 28(a)'s reference to customs duties. The guidance we find, however, suggests that the "customs duties" included in cover to the Islands cannot be read as broadly as the district court held in its memorandum opinion.
 
 
 25
 An examination of certain common features of the provisions of section 28 will reveal the reasons for our conclusion. Section 28(a) covers into the Islands treasury not only "customs duties" and "the proceeds of the United States income tax" but also "the proceeds of any taxes levied by the Congress on the inhabitants of the Virgin Islands, and the proceeds of all quarantine, passport, immigration, and naturalization fees collected in the Virgin Islands." "Inhabitants of the Virgin Islands" are defined for purposes of the cover provision as those "persons whose permanent residence is in the Virgin Islands."[33] The definition of inhabitant for purposes of the cover of taxes levied on inhabitants and the specification of the situs of collection for purposes of the cover of quarantine, passport, immigration and naturalization fees demonstrates an intent, at least as to those fees and taxes, that the cover be limited to amounts collected which have some substantial nexus to the Islands. This obvious intent concerning two specific categories of items to be covered suggests an overarching design for the entire cover provision, a design with which more ambiguous categories should be read consistently.
 
 
 26
 The district court, applying a different principle of construction, would read Congress' inclusion of specific limitations on only certain categories of items covered to exclude by implication such or similar limitations on the other categories mentioned. Doing so, however, leaves us with no guidance concerning the interpretation of "customs duties," when guidance is needed to avoid an absurd result, i. e., the cover into the Islands treasury of all customs duties, anywhere collected.
 
 
 27
 The guidance we gather from the whole of section 28(a) would limit the items covered to those with some substantial nexus to the Islands. Customs duties levied upon goods entering the Islands would certainly meet such a test; Congress itself selected situs of collection as the determinative variable for purposes of cover of quarantine, passport, immigration and naturalization fees. The question remains, however, whether customs duties collected here on items shipped from the Islands have a substantial enough nexus with the Islands to require cover to the Islands treasury.
 
 
 28
 The conclusion reached by the district court would require that cover to the Islands include duties levied on goods which merely pass through the Islands on their way to the mainland as well as duties levied on goods produced on the Islands and shipped here. However, certain other provisions of section 28 strongly suggest that Congress did not consider the mere passing through of goods enough of a nexus with the Islands to derive any advantage under the statute.
 
 
 29
 First, the limited "matching" rebate provision of section 28(b), discussed above, is restricted to internal revenue taxes "on articles produced in the Virgin Islands and transported to the United States" (emphasis supplied).[34] The language of the provision demonstrates an intent to exclude from rebate those taxes collected on items that are merely shipped from elsewhere through the Islands to the mainland. Second, section 28(d) provides for an exemption from customs duties and from certain internal revenue taxes for a good shipped from the Islands only if the good were grown or produced in the Islands and only if the total contribution of foreign materials to the good's value were fifty percent or less.[35] In other words, even goods whose value derived by more than fifty percent from Islands materials and which were shipped from the Islands were not given the benefit of the customs duty exemption unless they were also "produced" on the Islands. Thus, the language of the statute itself suggests that Islands production of the article might be an appropriate test of nexus for determining those customs duties to be covered and those to be retained.
 
 
 30
 We recognize that such a test strains the barren language of the statute somewhat more than a distinction based strictly on situs of collection. Such a test would, after all, require for its implementation a fairly elaborate administrative mechanism both to make the necessary inquiries concerning the place of the goods' production and to record this information for purposes of assessing the "cover." Unlike section 28(d), section 28(a) includes no express signal to the administrator that such an administrative mechanism will be required. A distinction based purely on situs of collection seems simpler to implement since one would reasonably assume that the information necessary to determine the cover could be obtained through available records independently compiled in the Islands and on the mainland.
 
 
 31
 Nevertheless, were we to have approached the question of statutory interpretation unencumbered by years of administrative practice under the 1954 Act that is consistent both with the Secretary's position in this court and with administrative interpretation of predecessor law or had we reason to believe that Congress has not been made aware of current or previous administrative practice and interpretation or were there an indication in the legislative history of the 1954 Act that administrative practice in this respect was to be altered, we might have looked with favor upon a construction of the statute which would have required cover to the Islands of customs duties levied upon goods produced in the Islands. However, the administrative, statutory and legislative history of the 1954 Act does not permit us this latitude.
 
 
 32
 B. Statutory, Administrative and Legislative History
 
 
 33
 As noted earlier,[36] administrative practice both before and after enactment of the 1954 Act has been to consistently withhold cover of customs duties levied on goods entering this country from the Virgin Islands. An erroneous administrative interpretation would not necessarily be saved by persistent administrative adherence to that interpretation and the district court, in rejecting the Secretary's emphasis on administrative practice, pointed to the lack of any evidence to show that Congress ever meant to limit the term "customs duties" to those locally collected. We think the more appropriate inquiry, however, is whether there was anything in the 1954 Act or its legislative history to show an intent to change an administrative course which, while not totally unopposed, nonetheless had been followed for more than thirty years before the 1954 Act was passed.
 
 
 34
 In our view, administrative interpretation and practice is controlling here for three reasons. First, the customs duties cover provision of the 1954 Act was taken from a bill proposed by the Interior Department,[37] which was vested by the 1936 Act and by executive order with substantial supervisory responsibility over the Islands[38] and whose own Secretary, thirteen years earlier, had registered with the Justice Department an official objection to the continuing failure to cover mainland duties.[39] Second, the applicable language as drafted and as enacted is substantially similar to that of the 1936 Act in effect when the Interior Department made its objections in 1941[40] and, although the Interior Department's draft[41] and the 1954 Act[42] expressly addressed a different aspect of Interior's 1941 objections (cover of internal revenue taxes), nothing in the proposed or enacted statute indicates a comparable intention to depart from settled administrative practice concerning the cover of customs duties. Third, nothing in the legislative history suggests that Congress meant to change the practice that prevailed as a result of consistent administrative interpretation of the earlier acts.
 
 
 35
 We recognize that a primary concern of the 1954 Act was to advance the Islands' self sufficiency and local autonomy[43] and that this concern is consonant with an interpretation of the Act to require the cover of mainland duties.[44] However, we cannot believe that so dramatic a change to the benefit of the Islands would be made without debate or even comment within the contours of an act where fiscal concerns weighed so heavily[45] and an innovative matching scheme for certain internal revenue taxes was featured so prominently.[46] There is, in fact, a hint that previous administrative practice was to be perpetuated. Addressing the proposed internal revenue tax cover, the Senate Report noted that under the law then in effect "all customs and import duties" were covered into the insular treasuries.[47] Since the only customs duties then being covered were those locally collected, this notation suggests that "customs ... duties" were understood by the committee to mean only customs duties locally collected. With this understanding as a basis, the similarity in language between the 1954 Act and the 1936 Act is thus even more suggestive of an intent to perpetuate prior practice.
 
 
 36
 Taken as a whole, the history of the 1954 Act indicates no intention, express or reasonably to be inferred, that Congress proposed to change the practice of covering over only local duties. For this reason, we vacate the district court's judgment and remand with directions to enter judgment in favor of the United States. Because of our disposition of this issue we do not reach the question whether an oil import license fee should be treated as a customs duty for purposes of assessing the amount to be covered into the Islands treasury under the 1954 Act.
 
 
 
 *
 In this opinion, we address that portion of No. 79-1021 dealing with the customs duties issue unique to the Virgin Islands case. In a companion opinion issued simultaneously herewith, we disposed of another portion of No. 79-1021 dealing with the covering over of gasoline tax revenues to the Virgin Islands
 
 
 **
 Sitting by designation pursuant to Title 28 U.S.C. § 292(a)
 
 
 [1]
 Commonwealth of Puerto Rico v. Blumenthal, 642 F.2d 622 (D.C.Cir.1980)
 
 
 [2]
 See id., at 623 n.1
 
 
 [3]
 Order, Virgin Islands v. Blumenthal, Civ. No. 79-0916 (Oct. 11, 1978), Appendix in Nos. 79-1021 & 79-1022 (Islands App.) at 136. The Islands had originally complained that the failure to cover these duties had violated both the Act of March 3, 1917, ch. 171, § 5, 39 Stat. 1132, 1133 (1917) (hereinafter cited as 1917 Act), and the Revised Organic Act of the Virgin Islands, Pub.L. No. 517, ch. 558, § 28(a), 68 Stat. 497, 508 (1954) (hereinafter cited as 1954 Act). The Islands' motion for partial summary judgment, which sought only declaratory relief, claimed entitlement solely on the basis of the 1954 Act. The trial judge concluded that the 1954 Act required the United States to cover over the customs duties at issue. Virgin Islands v. Blumenthal, Civ. No. 76-0916, slip op. at 11 (Oct. 11, 1978), Islands App. at 121, 131 (hereinafter cited as Memorandum). No such conclusion was reached concerning the 1917 Act. See id. at 10, Islands App. at 130. The precise retrospective intent of the order is unclear, but it is certain the trial judge contemplated some rebate of duties already collected. Id. at 14-15, Islands App. at 134-35
 The Secretary's cross-motion in the district court sought summary judgment "with respect to all of the issues in this action." Cross-Motion by Defendant for Summary Judgment, Virgin Islands v. Blumenthal, Civ. No. 76-0916 (filed Jan. 12, 1977), Islands App. at 25. Nevertheless, his supporting arguments and the district court's decisional rationale were tied to a construction of the 1954 Act. If the Secretary's motion implicitly posed the question whether the 1917 Act required the cover of customs duties collected on Islands' goods, the district court's memorandum did not address it and we thus do not consider that question to be properly before us.
 
 
 [4]
 Cited supra note 1. The 1954 Act was codified at 48 U.S.C. § 1541 et seq. (1976). Because that title of the United States Code has not been enacted into positive law, however, all citations in this opinion are to the session laws. See Preface, U.S.C. at VII (Supp. III 1979)
 
 
 [5]
 The district court rejected an argument made by the Islands that oil import license fees were "customs duties" within the meaning of the cover provisions of the 1954 Act. Such fees are imposed on petroleum products transported into the United States from the Islands. See Proclamation No. 4210, 3 C.F.R. 31 (1974). Because of our disposition of the customs duties claim on which this argument is predicated we need not reach the question whether oil import license fees are customs duties for the purposes of the cover provisions of the 1954 Act
 
 
 [6]
 Brief for Appellee in Nos. 79-1021 & 79-1022 at 3 (hereinafter cited as Islands Brief)
 
 
 [7]
 Id
 
 
 [8]
 1917 Act, supra note 3
 
 
 [9]
 Id. §§ 3-5, 39 Stat. at 1133
 
 
 [10]
 The Islands point out that St. Thomas, one of the Islands' constituent islands, was even in 1917 a "free port," and that Congress had been made aware of that fact. Islands Brief at 8, citing Cession of Danish West Indian Islands: Hearings on H.R. 20755 Before the House Comm. on Foreign Affairs, 64th Cong., 2d Sess. (31-) 32 (1917). Therefore, the covering over of locally collected duties would not have provided and could not have been intended to provide much revenue to the Islands, although the provision of revenue was one of the objectives of the 1917 Act
 
 
 [11]
 23 Comp. Dec. 574 (1917)
 
 
 [12]
 What the Comptroller decided was that only those duties described in section four of the 1917 Act were to be covered into the Islands' treasury. Apart from perpetuating previously applicable local customs laws, section four imposed a new "export duty" on sugar shipped from the Islands to any foreign country or to the United States. 1917 Act, supra note 3, § 4, 39 Stat. at 1133. Thus it seems that under the Comptroller's ruling this one form of "mainland duty," specific to Islands goods, was to be covered into the Islands treasury. The Comptroller found in Congressional debates an intent "that only revenue of the islands would be derived from articles imported thereto, except the export duty on sugar, which was imposed to compensate for the loss (of customs duties) on imports from the United States, which (under the 1917 Act) are to be admitted (to the Islands) free (of duty)." 23 Comp.Dec. at 576
 
 
 [13]
 Id. at 575
 
 
 [14]
 Id. at 575-76
 
 
 [15]
 35 Op.Atty.Gen. 63 (1926). The 1917 Act imposed internal revenue taxes as well as duties on Islands goods coming into the United States and provided for cover of the taxes as well as the duties "collected in pursuance of this Act." Thus, an expansive reading of the statute might have required cover of all internal revenue taxes, as well as all customs duties, collected on goods shipped from the Islands. However, a reading of the tax cover independent of the duty cover was rejected by the Attorney General's opinion, which followed the reasoning of the Comptroller General to deny cover of a post-1917 tax on imported alcohol. That tax, the Attorney General opined, was not collected "in pursuance of" the 1917 Act
 
 
 [16]
 The relevant provisions of the 1917 Act were replaced in 1936 by the first Organic Act of the Virgin Islands, ch. 699, 49 Stat. 1807 (1936) (hereinafter cited as 1936 Act). The "in pursuance of this Act" language was omitted and the pertinent language provided as follows:
 the proceeds of customs duties, less the cost of collection, and the proceeds of the United States income tax, and the proceeds of any taxes levied by the Congress on the inhabitants of the Virgin Islands, and all quarantine, passport, immigration, and naturalization fees collected in the Virgin Islands shall be covered into the treasury of the Virgin Islands and held in account for the respective municipalities, and shall be expended for the benefit and government of said municipalities in accordance with the annual municipal budgets. The Municipal Council of Saint Croix may make appropriations for the purposes of said municipality from, and to be paid out of, the funds credited to its account in the treasury of the Virgin Islands; and the Municipal Council of Saint Thomas and Saint John may make appropriations for the purposes of said municipality from, and to be paid out of, the funds credited to its account in said treasury.
 Id., § 35, 49 Stat. at 1816. The phrase "in pursuance of this Act" is also omitted from the relevant portions of the 1954 Act.
 
 
 [17]
 These objections were voiced in an opinion request dated February 28, 1941 from the Secretary of the Interior to the Attorney General. Islands App. at 94-95. Although the desirability of covering internal revenue taxes was emphasized, the Secretary urged the Attorney General to address cover of both taxes and duties. The request was supported by a memorandum from the Department of Interior Solicitor dated February 3, 1941, Islands App. at 88-93, which was critical of the 1917 decision of the Comptroller General. The Attorney General's opinion, issued March 3, 1941, adhered to the Justice Department's previous position. Islands App. at 96-100. See note 15, supra
 
 
 [18]
 The Islands governor was popularly elected for the first time on November 3, 1970. Virgin Islands Elective Governor Act, Pub.L. No. 90-496, 82 Stat. 837-842 (1968). See also H.Rep.No.1522, 90th Cong., 2d Sess. 6 (1968), U.S.Code Cong. & Admin.News 1968, p. 3548 (listing enactments since 1954 which "have provided greater self-government and responsibility for the Virgin Islands")
 
 
 [19]
 According to an affidavit submitted in support of the Secretary's application to this court for stay pending appeal, "A very rough approximation can be made that the customs duties on petroleum products imported into the United States from the Virgin Islands may have amounted from 1966 to 1976 to $97,452,307." Affidavit of G. R. Dickerson, Deputy Commissioner of the United States Customs Service, Appellants' Motion for Stay Pending Appeal of District Court's October 11, 1978 Order, App. D at 2 (filed Jan. 5, 1979)
 
 
 [20]
 Before gasoline production commenced in 1966 at the Amerada-Hess refinery in St. Croix, the total revenue collected on Virgin Islands shipments to the United States appears to have been small. Islands Brief at 3. But see Affidavit of G. R. Dickerson, supra, note 19 at 2. ("The Customs Service has no figures from which a reasonable estimate can be made of the amount of customs duties collected from 1917 to the present on articles imported into the United States from the Virgin Islands."). Since the Islands purchase in 1917 a certain proportion of the Islands' shipments has entered the mainland entirely duty-free. From 1917 to 1936 and apparently also from 1936 to 1954, customs duties were imposed on goods shipped from the Islands only when "foreign materials" comprised more than 20% of their value. 1917 Act, supra note 3, § 3, 39 Stat. at 1133. See 1936 Act, supra note 16, § 18, 49 Stat. at 1811 (perpetuating not inconsistent prior United States law applicable to the Islands). The permissible proportion of value derived from foreign materials was relaxed in 1954. Currently, goods from the Islands may enter duty-free if foreign materials contribute no more than 50% to their value. 1954 Act, supra note 1, § 28(d), 68 Stat. at 509
 
 
 [21]
 Letter from Associate Solicitor of the Department of the Interior Moody R. Tidwell to Assistant Attorney General Antonin Scalia (June 30, 1975). Islands App. at 101
 
 
 [22]
 Letter from Assistant Attorney General Antonin Scalia to Associate Solicitor of the Department of the Interior Moody R. Tidwell (Oct. 3, 1975), Islands App. at 105
 
 
 [23]
 Apart from customs duties, section 28(a) addresses: United States income tax; taxes levied by Congress on the inhabitants of the Islands; and quarantine, passport, immigration and naturalization fees collected in the Islands. Section 28(b) provides for a limited rebate of internal revenue taxes levied on "articles produced in the Virgin Islands and transported to the United States." (This provision is construed in the separate opinion also issued today in these consolidated cases. See note 3, supra.) Section 28(c) concerns an exemption from United States trademark law for certain goods imported into the Islands. Finally, section 28(d) imposed upon certain goods shipped from the Islands to the United States the same customs duties as are imposed on like goods imported from foreign countries
 
 
 [24]
 Memorandum, supra note 1, at 8-9, Islands App. at 128-29
 
 
 [25]
 Id. at 10, Islands App. at 130
 
 
 [26]
 Id. at 11, Islands App. at 131
 
 
 [27]
 Text preceding note 6, supra
 
 
 [28]
 The United States suggests that an absurd result be avoided by reading the phrase "collected in the Virgin Islands" to modify not only "quarantine, passport, immigration, and naturalization fees" but also "customs duties, ... income tax ... (and) taxes levied by the Congress on the inhabitants of the Virgin Islands." Brief for Appellant in Nos. 79-1021 & 79-1022 at 20-23. However, the particular phrasing and order of the provisions of section 28(a) of the 1954 Act follow those of section 35 of the 1936 Act, and in our view the 1936 Act is not susceptible of the reading suggested by the government
 Section 35 of the 1936 Act provided that
 the proceeds of customs duties, less the cost of collection, and the proceeds of the United States income tax, and the proceeds of any taxes levied by the Congress on the inhabitants of the Virgin Islands, and all quarantine, passport, immigration, and naturalization fees collected in the Virgin Islands shall be covered into the treasury of the Virgin Islands ....
 1936 Act, supra note 16, 49 Stat. at 1816. The interposition of the word "and" between the enumerated items in the 1936 Act makes it substantially more difficult to read "collected in the Virgin Islands" to modify each of the items listed and for this reason we reject the government's suggestion.
 
 
 [29]
 See Part II(B), infra
 
 
 [30]
 Exec. Order 2620 (May 15, 1917) (placing administration of customs laws in the Islands under the control of the Secretary of the Treasury). See 1936 Act, supra note 16, § 36, 49 Stat. at 1816 (Secretary of Treasury must appoint officers for administration of customs laws)
 
 
 [31]
 31 U.S.C. § 484 (1976) (requiring payment into United States treasury of "all moneys received from whatever source for the use of the United States")
 
 
 [32]
 Moreover, customs duties directly affect international and inter-territorial relations and are thus markedly distinguishable from other "local laws." Under the 1936 Act, for example, local authorities could not legislate a change in local customs duties, although they were empowered to impose other taxes. See 1936 Act, supra note 15, § 36, 49 Stat. at 1816. The 1954 Act is ambiguous in this respect. See 1954 Act, supra note 3, § 8(c), 68 Stat. at 501. However, in Virgo Corp. v. Paiewonsky, 384 F.2d at 575-79 (alternate holding), the third circuit held that the Islands legislature may enact export duties under the 1954 Act
 
 
 [33]
 1954 Act, § 28(a), 68 Stat. at 508
 
 
 [34]
 Id., § 28(b)
 
 
 [35]
 Id., § 28(d). This provision appears to represent both an incentive to Islands industry and an attempt to protect mainland industry from unfair Islands competition owing to the lower import duties paid by Islands industry on foreign materials. Standing alone it neither supports nor undermines the Islands' argument that a rebate of duties levied on non-exempt goods is required under section 28(a)
 
 
 [36]
 Text at notes 11-17, supra
 
 
 [37]
 S. 2321, 83d Cong., 1st Sess. § 26(a) (1953); H.R. 5181, 83d Cong., 1st Sess. § 26(a) (1953). S. 2321 was contemporaneously identified by the Department of the Interior as "the Department bill," Letter from Orme Lewis, Assistant Secretary of the Interior to Hugh Butler, Chairman of the Senate Committee on Interior and Insular Affairs (Nov. 30, 1953), reprinted in S.Rep. No. 1271, 83d Cong., 2d Sess. 13 (1954), U.S.Code Cong. & Admin.News 1954, p. 2585, H.R. 5181 and S. 2321 are identical. H.R. 5181, introduced "by request" by the Chairman of the House Committee on Interior and Insular Affairs on May 13, 1953, 99 Cong.Rec. 4904, was in fact the same bill submitted to the Speaker of the House by the Interior Department six days earlier. H.R.Rep. No. 1603, 83d Cong., 2d Sess. 18 (1954); 99 Cong.Rec. 8172 (1953) (remarks of Sen. Butler) (identifying H.R. 5181 as bill proposed by the Interior Department)
 Comparison of the Interior Department's proposed bill with the two other bills under active Committee consideration at the time reveals that the relevant text of the cover provision ultimately enacted was taken from the Interior Department's bill. With the exception of two provisos added by the Committee, the cover provision of the 1954 Act is identical to that proposed by the Interior Department and substantially different from that proposed by the Chamber of Commerce of the Virgin Islands, S. 2322, 83d Cong., 1st Sess. (1953); H.R. 5608, 83d Cong. 1st Sess. (1953), and by the Legislative Assembly of the Virgin Islands, S. 2323, 83d Cong., 1st Sess. (1953); H.R. 5835, 83d Cong., 1st Sess. (1953). In its report the Senate Committee acknowledged that "(m)ost of (the) provisions (in the reported bill were) adapted from one or the other of the bills before the committee ...." S.Rep. No. 1271, 83d Cong., 2d Sess. 1 (1954), U.S.Code Cong. & Admin.News 1954, p. 2585. Accord, H.R.Rep. No. 1603, 83d Cong., 2d Sess. 11 (1954).
 
 
 [38]
 1936 Act, supra note 16, § 20, 49 Stat. at 1812 (Islands governor must make reports to Interior Department); Id., § 23, 49 Stat. at 1813 (Secretary of Interior may appoint executive and administrative officers); To Provide a Civil Government for the Virgin Islands of the United States: Hearing on H.R. 11751 Before the House Comm. on Insular Affairs, 74th Cong., 2d Sess. 18 (1936) (statement of Arnold M. Golden) (advising against express provision in Organic Act for Interior Department control of Islands); Exec. Order No. 5556 (Feb. 27, 1931) (placing Islands administration under supervision of Secretary of Interior pending entrance on duty of civil governor)
 
 
 [39]
 See note 17, supra
 
 
 [40]
 See note 16, supra
 
 
 [41]
 S. 2321, supra note 37, § 26(b); H.R. 5181, supra note 37, § 26(b)
 
 
 [42]
 1954 Act, supra note 1, § 28(b), 68 Stat. at 508
 
 
 [43]
 See S.Rep. No. 1271, 83d Cong., 2d Sess. 4-5 (1954)
 
 
 [44]
 The district court reasoned, "It would be surprising if Congress intended that only the insubstantial amount of duties collected on imports into the Virgin Islands be covered into the Virgin Islands Treasury." Memorandum, supra note 3, Islands App. at 131
 
 
 [45]
 See S.Rep. No. 1271, 83d Cong., 2d Sess. 4-6 (1954)
 
 
 [46]
 An important aspect of the fiscal provisions of the Department of the Interior's bill was a proposal to rebate the full amount of certain internal revenue taxes collected here on Islands goods (See the separate opinion, supra note 3, issued today in these consolidated appeals). S. 2321, supra note 37, § 26(b); H.R. 5181, supra note 37, § 26(b). Although Congress responded favorably to this idea, the rebate proposal was trimmed considerably by imposition of the matching scheme ultimately enacted. See 1954 Act, supra note 3, § 28(b), 68 Stat. at 508; H.R.Rep. No. 1603, 83d Cong., 2d Sess. 13-14 (1954); S.Rep. No. 1271, 83d Cong., 2d Sess. 5 (1954):
 To remedy this situation (the Islands' dependence on Congressional "handouts"), the committee has worked out a limited return or grant of the internal revenue taxes on Virgin Islands products. For every dollar of local revenue, including Federal income taxes, which the people of the islands raise, a dollar of the internal revenue taxes on Virgin Islands products would be granted to them, automatically.
 This careful and not completely generous approach is hardly consistent with an unqualified reversal sub silentio of the longstanding practice of retaining in the United States treasury customs duties collected here on Islands shipments.
 
 
 [47]
 Id. at 4